IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DERRICK TOOMER,     *
     Plaintiff,
 v.        * CIVIL ACTION NO. DKC-13-3072

WEXFORD MEDICAL HEALTH CARE *
PROVIDER, et al.,
     Defendants.  *
         ***

## MEMORANDUM OPINION

Pending are Motions to Dismiss, or in the Alternative Motion for Summary Judgment filed by Defendants Wexford Health Sources, Inc., Ava Joubert, M.D., Gregory Flury, P.A., and April Shipley, L.P.N.  ECF Nos. 19 & 30.  Plaintiff has responded.[1]  ECF Nos. 24 & 26. Defendants have replied (ECF No. 25) and Plaintiff has filed a surreply.  ECF No. 27.  Upon review of the papers and exhibits filed, the court finds an oral hearing in this matter unnecessary.  *See* Local Rule 105.6 (D. Md. 2014).  For the reasons stated below, the dispositive motions will be granted.

### Background

The case was instituted upon receipt of Plaintiff Derrick Toomer's complaint alleging he had been denied constitutionally adequate medical care.  ECF No. 1.  In support of his complaint, Plaintiff alleges that on May 15, 2013, while incarcerated at the North Branch Correctional Institution ("NBCI"), he was given the wrong dosage of insulin which caused him to lose consciousness and fall during a basketball game.  *Id.*, p. 4.  He states that correctional staff quickly took him to the medical unit where he was seen by a nurse and sent back to his cell.

---

[1] Plaintiff filed his response and surreply in response to the dispositive motion filed by Defendants Wexford Health Sources, Inc., Ava Joubert, M.D., and Gregory Flury, P.A.  ECF No. 19.  Plaintiff was notified that April Shipley filed a dispositive motion and he was entitled to respond to same.  ECF No. 31.  Plaintiff did not file any additional opposition in response to that Shipley's Motion, which adopted and incorporated the Motion filed by Defendants Wexford Health Sources, Inc., Ava Joubert, M.D., Gregory Flury, P.A (ECF No. 19).

Plaintiff states that his foot swelled to twice its normal size and the bottom of his foot turned black.  Plaintiff states that correctional staff called the medical department and was told by "Nurse April" that "she didn't care, [he] could write her up [Plaintiff had] been seen already." *Id*.

Plaintiff states he endured extreme pain for the next 60 hours before being seen by Dr. Joubert who ordered x-rays.  The x-rays showed Plaintiff suffered a hair line fracture of the fibula.  He was admitted to the infirmary at Western Correctional Institution ("WCI"), provided ice, and his leg wrapped in an ace-bandage.  Plaintiff states that the weight of the ice increased his pain and he fought with nurses to keep the ice off of his leg until May 16, 2013, when he was seen by Dr. Ottey who prescribed Tylenol 3 and an injection twice daily which managed Plaintiff's pain.  *Id*.

On May 19, 2013, Dr. Joubert examined Plaintiff and remarked, "Oh, I thought someone would've taken care of you by now."  *Id*., p. 4.  Joubert put a half-cast half-splint on Plaintiff's lower leg and foot.  *Id*., p. 5.  Plaintiff asked why he was not being provided a hard cast and Joubert, Dr. Stallworth, and "every nurse that came near [him]" replied, "They couldn't and wouldn't touch [his]my leg until a[n] orthopedic specialist evaluated [him]."  *Id*.  Plaintiff states he was returned to his cell to wait for an appointment with the orthopedist.

Plaintiff was scheduled to see the orthopedist on June 7, 2013, but on that date was informed that he had a court date for the same day.  Security at the Jessup Correctional Institution ("JCI") advised Plaintiff that his court appearance would take precedence over his hospital appointment.  Plaintiff refused to go to court, security cancelled his doctor's appointment, and he was returned to NBCI.  *Id*.

Plaintiff was rescheduled and transported to Bon Secours for evaluation by Dr. Chris[2] in late June.  Dr. Chris, the orthopedic specialist, advised Plaintiff that had he been seen within seven days of his injury "it would've been a simple fix" but given the amount of time that passed he would need steel screws in his fibula, a steel plate on his ankle, and the tendon reattached.  *Id.*

Plaintiff underwent surgery on July 18, 2013.  A month later he was brought back to Bon Secours to have the staples removed.  After removing the dressing, Dr. Chris wrapped Plaintiff's lower leg with a clear dressing and ace bandages.  He was told to test putting weight on the leg, and to shower with both the clear dressing and ace bandage, *Id.,* p. 5

In mid to late August, Plaintiff's dressing began to come off and peel.  Plaintiff submitted a sick call slip.  He was seen by Joubert who cleaned the wound, rewrapped it, and provided Plaintiff fresh ankle wraps.  *Id.*, p. 6.  Plaintiff was scheduled to return to Bon Secours on September 16, 2013, for follow-up, but security refused to take him as he did not have the proper paperwork for his ankle wrap or ace bandages.  *Id.*  P.A. Flury refused to provide Plaintiff the paperwork to go the hospital.  *Id.*

Plaintiff submitted several sick call slips regarding the incident and Joubert advised him that it was his fault he was not transported as he should have removed the ankle wrap and ace bandage, despite Joubert having previously instructed him to shower with the ankle wrap and bandage on and not to take it off.  *Id.*  Due to continued swelling in his ankle, Plaintiff asked Joubert to renew the paperwork for his ankle wrap, bandages and crutches but she replied that Plaintiff was standing tall and did not need crutches.  *Id.*

Plaintiff states his ankle and lower leg cause him pain and the top of his foot is swollen and does not bend the way it should.  *Id.*  He states that he takes narcotics to control the pain and

---

[2]      The court concludes Plaintiff is referring to Dr. Krishnaswamy, the orthopedic surgeon who treated Plaintiff at Bon Secours.

will need to do so for the rest of his life.  He indicates the steel screws and plate will remain in his leg for the rest of his life.  *Id.*, p. 8.

Plaintiff indicates that Joubert and Flury have animus toward him for unknown reasons and have deliberately refused to provide him care.  ECF No. 25.

Defendants indicate that Plaintiff suffers from insulin dependent diabetes and suffered a left ankle fracture with ligament tear which required surgical repair.  ECF No. 19, Ex. 1, pp. 3-4; Ex. 2.  Plaintiff has been non-compliant with the management of his diabetes including refusing insulin and diabetic assessments for blood glucose monitors.  He also refused to adhere to a diabetic diet.  *Id.*  Additionally, Plaintiff has been non-compliant with care related to his ankle injury in that he has refused to attend scheduled follow-up appointments with the orthopedic specialist and has been non-complaint with directives regarding elevating the ankle, applying ice, and keeping weight off of the ankle.  *Id.*

Plaintiff receives 75 units of long acting insulin administered by nursing staff subcutaneously every evening, with additional units administered based on Plaintiff's blood glucose levels as determined by a finger stick test.  *Id.,* Ex. 1, pp. 283-84; Ex. 2.  If Plaintiff refuses the blood glucose test it is not possible for staff to determine whether additional insulin units are required above Plaintiff's daily dose.  *Id.*, Ex. 2.

On the morning of May 14, 2013, Plaintiff refused the blood glucose test.  *Id.*, Ex. 1, pp. 229, 237.  That evening, Nurse Buck was called to evaluate Plaintiff for complaints of dizziness. *Id.*, pp. 1-2.  Plaintiff advised Buck that he became dizzy during a basketball game and almost passed out.  He denied any symptoms during the assessment and was alert and oriented.  His

blood glucose level was 127, within normal limits for a person with Type II diabetes.[3]  *Id*.; Ex. 2. Plaintiff's gait was steady.  *Id*., Ex 1, pp. 1-2.  He was instructed to rest, increase his fluids, and submit a sick call slip if he experienced a worsening of symptoms.  *Id*.  He was seen the following morning by Dr. Joubert.  *Id*., pp. 3-4.  Joubert reviewed the tape of the exercise yard and observed Plaintiff walking without difficulty when he began to wobble slightly, recovered, stood against the wall, then fell to the ground.  *Id*.  Joubert advised Plaintiff that his diabetes was "chronically" out of control.  Plaintiff denied chest pain, shortness of breath, heart palpitations, excessive thirst, foot ulcers, frequent infections, frequent urination, slow healing wounds or sores, tooth of gum disease changes in weight, or heartburn.  *Id*. Joubert noted that the injury to plaintiff's ankle was a result of the fall the previous day.  She ordered x-rays of Plaintiff's left foot and ankle which were completed that morning.  The preliminary results of the x-rays showed no acute evidence of a fracture of the foot but did show an acute fracture of the ankle. Plaintiff was admitted to the infirmary at WCI for observation.  Joubert also ordered a "tong splint" for Plaintiff's left ankle.

After being admitted to the WCI infirmary, he was seen by Kimberly Martin, R.N. Plaintiff told Martin he had not taken his medication that day and was hungry.  *Id*., pp. 5-6. Swelling was observed around Plaintiff's left ankle.  His foot and ankle were wrapped with an ace bandage, ice applied, and the ankle elevated.  Plaintiff's blood sugar was 447.  Toradol was prescribed for pain relief and 15 units of Humulin for his elevated blood-glucose levels.  He was also given lunch.  *Id*.

Plaintiff advised Lori Schafer, R.N. during infirmary rounds that his toes hurt, his foot wrap was too tight, and he needed pain medication.  *Id*., p. 7. Schafer noted swelling of

---

[3]  Plaintiff's blood glucose was also taken approximately an hour earlier and registered 267, which Joubert notes is high, but not uncommon for a person with Type II diabetes.  *Id*., Ex 1, p. 229, Ex. 2.

Plaintiff's left ankle.  His foot and ankle were rewrapped with the ace bandage, ice applied, and the leg elevated.  Plaintiff's blood sugar was 386. He ate his dinner and offered no further complaints that night.  *Id*.

On May 16, 2013, at 1:15 a.m., he complained that the pain in his ankle was seven out of ten.  *Id*., pp. 8-9.  Blood sugar levels taken at 4:20 a.m. registered 207.  He refused insulin.  At 7:45 a.m., Plaintiff advised that he no longer wanted to elevate the leg or apply ice to the ankle.  *Id*., p. 12.  At approximately 9:30 a.m. he requested to leave the infirmary and return to his cell.  *Id*.

Around that same time, Plaintiff was seen by Renato Espina, M.D.  *Id*., pp. 10-11.  Espina noted the area was wrapped with an ace bandage, slightly swollen, and tender to the touch.  Plaintiff complained of pain.  Espina also noted Plaintiff was diabetic with poorly controlled blood sugar.  *Id*.  Espina ordered Plaintiff on bed rest and to ambulate with a walker.  He also ordered an orthopedic consultation.  Plaintiff received a walker that afternoon, along with pain medication.  *Id*., p. 12.

Later that day, Plaintiff complained that his pain was a ten out of ten.  He also asked to be taken off the diabetic diet and placed on a 2400 calorie diet with a snack bag.  *Id*., p. 13.  His blood sugar was tested at 4:00 p.m. and was 206.  Dr. Ottey approved Plaintiff's diet request.  *Id*.

On May 17, 2013, at 12:10 a.m, Plaintiff advised Karen Meyers, R.N. that he received a shot which relieved his pain.  *Id*., p. 14.  He advised that he did not need ice and did not want to elevate his foot.  He reported his pain as a zero out of ten.  Swelling of the Plaintiff's left ankle was noted.  *Id*.  Later that morning Plaintiff advised Kimberly Martin, R.N. that his ankle did not hurt unless he moved it.  *Id*., pp. 16-18.  That afternoon he advised staff he was refusing medication until he was seen by a doctor.  *Id*.  Shortly thereafter he was seen by Dr. Ottey.

Plaintiff reported pain in the left ankle but no tingling or numbness.  Decreased range of motion was noted.  Plaintiff was told to elevate the ankle, apply ice, continue his current medications, and was granted partial weight-bearing status.  *Id*., pp. 16-18.

Plaintiff remained in the infirmary on May 18, 2013.  Patricia Knotts, R.N., observed that Plaintiff complained of pain when he moved his foot.  His blood sugar at 4:00 a.m. on May 18, 2013 was 118.  *Id*., p. 20.  Later that day, Nurse Ravenscroft noted Plaintiff offered no complaints and was pleasant and cooperative.  *Id*., pp. 21-22.  Minimal swelling of Plaintiff's ankle was noted.  He was able to move his toes and reported pain as six out of ten.  That afternoon Plaintiff's blood sugar measured 126.  *Id*., pp. 21-22.  That same day, Plaintiff was seen by Dr. Ottey.  *Id*., pp. 23-25.  Plaintiff reported pain but stated medication gave him relief.  He was advised to continue with his current treatment plan.  *Id*.

On May 19, 2013, while in the infirmary, Plaintiff reported his ankle was getting better and denied numbness or tingling.  Decreased swelling was observed.  He ambulated with a walker.  He was given a Toradol shot for pain.  At various times he rated his pain at six out of ten and four of ten.  *Id*., pp. 26, 28.  He was seen that day by Dr. Joubert who applied a tong splint and directed Plaintiff to continue rest, elevating and icing of his ankle.  Joubert noted she was waiting for the final interpretation from the radiologist and planned to call Dr. Krishnaswamy, an orthopedic specialist at Bon Secours.  *Id*.

On May 20, 2013, while in the infirmary, Plaintiff reported his pain as eight out of ten. *Id*., p. 73.  He denied numbness or tingling.  He was given Toradol. *Id*., p. 33.  That day at 11:04 a.m., the radiologist's reading of plaintiff's x-rays were posted which showed no fracture of the left foot but an acute left ankle fracture of the distal end of the fibula with no significant displacement.  *Id*., p. 256; Ex. 2.

Plaintiff was seen that day by Joubert during rounds. *Id.*, p. 34-35. Plaintiff's ankle was stable and it was noted his diabetes had been better controlled during his infirmary stay. Joubert called Krishnaswamy to discuss the final radiology reports and treatment options. *Id.*; Ex. 2. Pending examination of Plaintiff by Krishnaswamy it was decided that Plaintiff's injury could continue to be managed with the splint, he was to remain non-weight bearing with crutches when ambulating, and he should regularly elevate the leg to reduce swelling. *Id.*, Ex. 2. The x-ray results were reviewed with Plaintiff. *Id.*, Ex. 1, pp. 34-35.

On May 21, 2013, while in the infirmary, Plaintiff's blood sugar remained controlled in the morning. *Id.*, p. 36. In the evening his blood sugar was high but he refused insulin. *Id.*, 40, 242. He requested pain medication and to see a doctor. He received a shot of Toradol and thereafter did not offer any complaint of pain. Plaintiff was seen by P.A. Lum who reported Plaintiff was without pain and stable, but showed weakness in the left foot. *Id.*, pp. 36-40. Lum advised Plaintiff to continue with his treatment plan. *Id.* During her rounds, Nurse Schultz observed swelling in Plaintiff's toe. His splint was intact, and he denied pain, numbness or swelling. *Id.*, p. 40.

Infirmary notes the following day show that after receiving his morning pain medication, Plaintiff reported no pain. He asked to be returned to NBCI, stating that his leg hurt only when he moved it back and forth. *Id.*, p. 41. In the afternoon, Plaintiff instructed the nurse on rounds not to enter his cell as he did not want to be seen by anyone. *Id.*, p. 43. He refused to have his blood pressure and blood sugar tested. That afternoon he refused to take his insulin. Later that night, Plaintiff reported pain ten out of ten and his blood sugar was 324. Dr. Stallworth directed Plaintiff be given the insulin shot he refused that evening. Plaintiff again expressed his desire to

leave the infirmary and was directed to cooperate with medical staff.  *Id.*  Later, he was observed standing without pain.  *Id.*

On May 23, 2013, at 12:30 a.m., Plaintiff complained to nursing staff that his left ankle hurt when he moved it side to side.  He was told to keep weight off the ankle.  *Id.*, pp. 46-47.  He was seen that day by Dr. Stallworth for follow up.  *Id.*, pp. 44-45.  Joubert informed Stallworth that the fracture was not comminuted (broken in several places) as originally believed.  Plaintiff again expressed his desire to return general population.  Plaintiff's prescriptions for Tylenol 3 and Toradol were discontinued.  Plaintiff's ankle showed full range of motion without pain and Stallworth discharged Plaintiff to the general population with orders to follow up with Joubert in one week.  *Id.*, pp. 49-50.  Plaintiff was provided crutches and informed always to use them when ambulating until cleared by a physician.  *Id.*

Plaintiff was seen by Ottey the following day.  *Id.*, pp. 53-55.  Plaintiff reported pain and swelling in his ankle and advised that the splint was too tight.  Ottey readjusted the splint and wrapping.  He ordered crutches for Plaintiff for three months, a pillow for elevation, and informed Plaintiff to keep the ankle elevated.  He was scheduled for follow up for one week.  *Id.*

Plaintiff placed sick calls lips on May 26, 28, and 30, 2013, complaining that his eyes were burning, his skin was discolored, and he had large bumps around his eyes.  *Id.*, pp. 196-198.  He requested to see Ottey.  *Id.*  He was seen on June 1, 2013, by Ottey but offered no complaints regarding burning eyes or skin issues.  Plaintiff reported pain in his ankle but no numbness or tingling.  *Id.*, pp. 57-59.  He advised Ottey that he was awaiting an orthopedic evaluation.  Ottey noted the x-ray showed the fracture was non-displaced, and Plaintiff had decreased range of motion in the ankle on exam.  Plaintiff's prescription for Tylenol 3 was renewed and he was

directed to follow up in in two weeks.  Ottey also requested Plaintiff's court date be rescheduled due to his injury.  *Id*.

On June 4, 2013, Plaintiff was evaluated by Nurse Bruno.  *Id*., pp. 62-63.  She noted that Plaintiff complained that his splint was broken and causing him pain.  His eyes were swollen and the surrounding skin discolored.  Plaintiff stated he had been given Toradol which gave him an adverse reaction; however, Plaintiff's records showed that his prescription for Toradol had been discontinued on May 12, 2013.  *Id*., pp. 44-45, 62-63.

On June 7, 2013, Plaintiff returned to NBCI from court.  *Id*., p. 65.  It was noted that Plaintiff's medical trip for orthopedic consult had been cancelled by custody due to conflicting schedules.  *Id*.; Ex. 2.  Plaintiff's splint was broken and irritating Plaintiff in several places.  During the visit Plaintiff tore off his old splint and threw it in the trash.  Ottey was consulted.  He advised that a new brace would be given and the orthopedic visit re-scheduled.  Plaintiff's crutches were broken and Plaintiff was returned to his cell in a wheelchair.  Later, he was given new crutches and an ankle brace, which he signed for.  *Id*., p. 65.

On June 10 and 11, 2013, Plaintiff refused to have his blood drawn. *Id*., pp. 246-247.

On June 13, 2013, Plaintiff was evaluated by Joubert in response to his sick call slips.  *Id*. pp. 66-67.  He complained of pain in his left ankle.  Plaintiff's foot had mild swelling and pain with motion.  Joubert also noted Plaintiff had a prior allergic reaction to medication which resolved.  *Id*.

Ottey noted, on June 19, 2013, that he did not see Plaintiff for his scheduled visit because Plaintiff was out for a medical visit.  *Id*., pp. 69-70.  Plaintiff was provided a loaner pair of crutches for the trip which were to be returned when he returned to NBCI.  *Id*., p. 69.

Plaintiff was seen by Dr. Krishnaswamy at Bon Secours Hospital on June 21, 2013.  *Id.*, pp. 261-69.  Plaintiff complained of continued pain, weakness and swelling in his ankle.  He advised that he had been given the wrong medication which caused weakness which led to his fall on May 14, 2013.  It was noted that Plaintiff had an allergy to Toradol.  Upon examination, Plaintiff's ankle had moderate tenderness and swelling.  Movements were described as tender and restricted.  X-rays revealed a healing displaced fracture of the left lateral malleolus with callus formation and increased swelling and gap over the medial aspect.  He was also diagnosed with a healing tear of the deltoid ligament of the left ankle with a healing spiral fracture of the left lateral malleolus.  Plaintiff was advised that he would need exploration surgically of the left ankle with repair of the deltoid ligament and an open reduction internal fixation with plate and screws to the lateral malleolus.  The procedures, risks and benefits, were explained to Plaintiff.  *Id*.

Plaintiff was evaluated by Joubert on June 27, 2013.   *Id.*, pp. 72-73. She noted Krishnaswamy's findings and recommendations and prepared a consult for approval of the surgery.  *Id*.  Plaintiff underwent a preoperative evaluation by Joubert on July 9, 2013. *Id.*, pp. 76-78.

On July 18, 2013, Plaintiff was transferred to Bon Secours for surgery, which he tolerated well.  *Id.*, pp. 272-275.  The same day, Plaintiff was seen by Lum Maximuangu, RNP, who noted that Plaintiff had been discharged post-surgically.  *Id*, pp. 83-85.  Plaintiff was to return for follow-up with the orthopedic surgeon in two weeks.  He was admitted to the Jessup Correctional Institution ("JCI") infirmary with 24 hour observation for security.  He was scheduled to be transferred to NBCI the following morning.  He was stable and was directed to keep the leg elevated, and engage in no strenuous exercise, work, or heavy lifting.  *Id*.

The following day, Plaintiff was evaluated by nursing staff. He received insulin and pain medication. He appeared in no distress. His ankle was slightly swollen. *Id.*, p. 86. Later that day, he was transferred to the WCI infirmary. *Id.*, p. 103. He was able to ambulate to the infirmary on crutches. He was given pain medication and showed no signs of distress. *Id.*, p. 103. He was seen that day by Ottey. *Id.*, pp. 104-07. Plaintiff reported no numbness or tingling. He was placed on bed rest with bathroom privileges, directed not to work or exercise, and to keep the ankle elevated. *Id.*

On July 20, 2013, Plaintiff reported being in a lot of pain. *Id.*, p. 108. His wrap and dressing were dry, clean and intact. He was able to move his toes, which were mildly swollen. Later that day, he began yelling and screaming about being released. *Id.*, p. 111. He demanded to be sent back to NBCI and threatened to "tear the place up" if he was not transferred. He was advised that he would be transferred when a doctor cleared him for general population. *Id.*

The following day, Plaintiff refused to have his vital signs checked or to be fully assessed. After being educated on the need to take his antibiotics to prevent post-surgery infection, he then agreed to take all of his medication and permit an abbreviated examination of his splint and dressing, which were intact. He was able to wiggle his toe and move his extremities. His blood sugar was elevated; however, he refused insulin. *Id.*, p. 112. Later that day, Dr. Stallworth examined Plaintiff who inquired when he might be able to leave. *Id.*, pp. 113-14. Plaintiff was advised that pursuant to Ottey, not before Monday. *Id.*, pp. 113-115.

On July 22, 2013, Plaintiff again advised staff that he was hoping to return to NBCI the next day and was okay with the pain. *Id.*, p. 116. Later that day, he was discharged from the infirmary to segregation housing to await his transfer to his post-surgical follow up visit. *Id.,* p. 117. Plaintiff was disruptive and banging on his cell doors asking when he was going to leave.

*Id.,* pp. 118-19.   His crutches were confiscated due to his improper use of them.   He was informed he would leave when the escort came to get him.   He was taken for his follow up visit, returned the same day, and cleared for general population.   *Id.*, p. 121.

Plaintiff was seen on July 23 and July 25, 2013, for complaints unrelated to his ankle. *Id.*, pp. 119, 122-124, 204.

He was seen by P.A. Flury on July 26, 2013, and reported minimal ankle pain.   He did not request renewal of his Neurontin prescription.   *Id.*, pp. 125-27.

Plaintiff submitted a sick call slip on August 14, 2013, complaining of pain in his left ankle and requesting to see Ottey regarding his medication.   *Id.*, p. 206.   He was seen the following day by Nurse Swan.   *Id.*, pp. 136-37.   He stated that his cast had gotten wet and expressed fear that the surgical site would get infected.   He requested to be taken off Tylenol 3 due to his concerns that it was addictive.   Plaintiff's assessment occurred though his cell door as the prison was on lock down.   He was able to limp to the door but was not able to bear full weight.   His cast was observed to be intact.   The nurse placed a provider referral.   *Id.*

Plaintiff was seen by P.A. Flury on August 18, 2013, to follow up regarding his ankle surgery.   *Id,* pp. 139-41.   Plaintiff advised that the cast had gotten wet but since dried.   He again requested to discontinue his prescription for Tylenol 3.   Flury advised Plaintiff he did not have the authority to discontinue medications, but that Plaintiff's prescription for Tylenol 3 was "take as needed," so Plaintiff did not have to take it.   He also noted that Plaintiff was scheduled for a post-surgical follow up in one week.   Plaintiff was brought to the medical room in a wheelchair and was able to stand and partially bear weight on his ankle.   Flury discussed noncompliance with restrictions on weight-bearing with Plaintiff.   *Id.*

Plaintiff returned to Bon Secours on August 30, 2013, for his follow-up appointment with Krishnaswamy.  *Id*., pp. 279-81.  His splint was removed and the surgical wound appeared to be healing well.   Dressings and an ace bandage were reapplied.   X-rays showed satisfactory alignment of the fracture with the plate and screws in good position.   Plaintiff was advised that the dressings could stay in place for two to three days.  He was advised to continue using the ace bandages and was instructed to do full range of motion exercises and bear full weight on his left leg.  *Id.*

On September 5, 2013, Plaintiff was seen by Joubert for follow up regarding Plaintiff's diabetes, hypertension and surgical aftercare.  *Id*., pp. 145-47.  Plaintiff was experiencing slow healing due to his diabetes.  Joubert placed an order for an orthopedic consultation to occur in four weeks with Krishnaswamy.   It was noted that Plaintiff's ankle was improving.   Joubert requested x-rays of Plaintiff's ankle, which were taken on September 9, 2013.   The x-rays showed a "sub-acute fracture with post treatment.   Metallica hardware in place along distal fibula.  Joint space is unremarkable."  *Id*., p. 259.

Plaintiff filed a sick call slip on September 13, 2013, stating he needed his dressing changed and his medication renewed and/or adjusted.  *Id*., p. 207.  He filed another sick call slip on September 14, 2013, complaining of an open sore on his left foot.  *Id*., p. 208.  Unsigned notes reflect:  "Plaintiff has band aid.  No open sores.";  Plaintiff could not be seen in medical because he was being taken out for a medical visit; and the trip was cancelled due to Plaintiff's failure to remove his ace bandage.  *Id.*

Later that day Plaintiff was seen by Nurse Cortez because he requested a medication adjustment and his order for crutches renewed.  *Id*., pp. 148-150. Cortez did a limited assessment

through Plaintiff's cell door due as the prison was on lock down.  Cortez noted there was no active order for crutches.  *Id.*

Plaintiff was evaluated by Joubert on September 19, 2013, after submitting sick call slips regarding problems with his left foot.  *Id.*, pp. 151-152.  When Plaintiff arrived for his examination he reported that he did not have problems with his left foot but rather with his right. He stated he had a sore on his right foot which had healed.  No scar or signs of a sore were noted. Joubert noted that Plaintiff's follow-up visit with the orthopedist was cancelled because Plaintiff claimed he needed to wear his ace bandage for swelling but did not have the proper paperwork to travel with the ace bandage.  *Id.*  Joubert rescheduled Plaintiff's orthopedic follow up visit and stated that Plaintiff did not need to have the ace wrap.  *Id.*

Plaintiff filed a sick call slip on September 22, 2013, seeking renewal of the order for crutches.  *Id.*, p. 209.  He was seen the following day by Cortez at his cell door, due to continued prison lock down.  Plaintiff complained of left ankle discomfort.  He requested renewal of the order for crutches.  He reported his pain was seven out of ten and the screw was pinching him. He was observed walking with a normal gait.  He was given a cold compress and heat application and instructed to follow his exercise program.  *Id.*

On September 25, 2013, he did not go to his off-site orthopedic follow up.  No explanation is provided on the note.  *Id.*, p. 155.

On September 28, 2013, he was seen by Ottey who noted Plaintiff reported pain in his ankle and a sensation that something sharp was piercing him at the surgery site.  *Id.*, pp. 157-61. Plaintiff's ankle had some swelling and decreased range of motion.  Ottey renewed Plaintiff's order for an ankle brace, ace bandages and crutches.  *Id.* On September 30, 2013, he also ordered Tramadol for pain relief.  *Id.*, pp. 163-163.

Throughout October 2013, Plaintiff offered no complaints regarding his ankle, although he was seen by medical staff for other issues. *Id*., pp. 251, 166-69. On October 30, 2013, he refused to go to his orthopedic follow up appointment because he had an appointment with his attorney that he could not miss. *Id*., pp. 170, 253.

Plaintiff submitted a sick call slip on November 6, 2013, asking that his medication be renewed. *Id*., p. 211. He submitted another sick call slip on November 8, 2013, requesting that his orthopedic consult be rescheduled, and again requesting his medication be renewed. *Id*., pp. 213-15.

On November 9, 2013, Plaintiff refused to be taken to his sick call visit. *Id*,. p. 171, 254.

On November 11, 2013, Plaintiff was seen by Robustiano Barrera, M.D. for complaints regarding his ankle. *Id*., pp. 172-74. Barrera referred Plaintiff for an orthopedic consult to check Plaintiff's hardware. *Id*. X-rays of Plaintiff's left foot and leg were received on November 18, 2013, and showed the hardware stable with no acute fracture or dislocation seen. *Id.,* p, 260.

Plaintiff was seen by medical providers throughout December, 2013 for his other health concerns and offered no complaints regarding his ankle. *Id*., pp. 177-89.

He was evaluated by Joubert on January 13, 2014 and requested renewal of  paperwork for crutches, ace bandages, and an ankle brace. Joubert noted Plaintiff's refusal of his follow up visits with the orthopedist on September 20, 2013 and November 1, 2013. He was observed in no apparent distress. *Id*., pp. 190-91. He was again seen by Joubert on January 22, 2013, due to his request for renewal of ace bandage and an ankle sleeve. Plaintiff was again observed in no apparent distress. His left ankle showed post-operative scarring but no swelling and he had a mildly reduced range of motion. Joubert renewed the paperwork for Plaintiff's wrap and sleeve. *Id*.

**Standard of Review**

A.    Motion to Dismiss

The purpose of a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) is to test the sufficiency of the plaintiff's complaint. *See Edwards v. City of Goldsboro,* 178 F.3d 231, 243 (4th Cir. 1999). The dismissal for failure to state a claim upon which relief may be granted does not require defendant to establish "beyond doubt" that plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 561 (2007). Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint. *Id*. at 563. The court need not, however, accept unsupported legal allegations, *see Revene v. Charles County Comm'rs,* 882 F.2d 870, 873 (4th Cir. 1989), legal conclusions couched as factual allegations, *see Papasan v. Allain,* 478 U.S. 265, 286 (1986), or conclusory factual allegations devoid of any reference to actual events, *see United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979).

B.    Motion for Summary Judgment

Summary Judgment is governed by Fed. R. Civ. P. 56(a) which provides that:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc*., 477 U. S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002). The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) the Supreme Court explained that in considering a motion for summary judgment, the "judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. at 248. Thus, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Id*. at 252.

The moving party bears the burden of showing that there is no genuine issue as to any material fact. No genuine issue of material fact exists if the nonmoving party fails to make a sufficient showing on an essential element of his or her case as to which he or she would have the burden of proof. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Therefore, on

those issues on which the nonmoving party has the burden of proof, it is his or her responsibility to confront the summary judgment motion with an affidavit or other similar evidence showing that there is a genuine issue for trial.

**Analysis**

A.      Supervisory Liability

The law in the Fourth Circuit is well established that the doctrine of *respondeat superior* does not apply in §1983 claims.  *See Love-Lane v. Martin*, 355 F. 3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under §1983).  Liability of supervisory officials "is not based on ordinary principles of *respondeat superior*, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'"  *Baynard v. Malone*, 268 F. 3d 228, 235 (4th Cir. 2001) citing *Slakan v. Porter*, 737 F. 2d 368, 372 (4th Cir. 1984).  Supervisory liability under § 1983 must be supported with evidence that:  (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.  *See Shaw v. Stroud*, 13 F. 3d 791, 799 (4th Cir. 1994).

Plaintiff's claims focus on the delivery of primary health care:  the failure promptly to treat his fracture and the failure to return him for follow-up care after the surgery.  These claims as asserted against Wexford Medical Health Care Provider fail.  Plaintiff has pointed to no action

or inaction on the part of Wexford that resulted in a constitutional injury, and accordingly, his claims against Wexford shall be dismissed.

B.    Medical Claim

The individual health care providers are entitled to summary judgment.  The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of  its guarantee against cruel and unusual punishment.  *Gregg v. Georgia*, 428 U.S. 153, 173 (1976).  "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment."  *De'Lonta v. Angelone*, 330 F. 3d 630, 633 (4th Cir. 2003) citing *Wilson v. Seiter*, 501 U.S.294, 297 (1991).  In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need.  *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976).  Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure the needed care was available.  *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

As noted above, objectively, the medical condition at issue must be serious.  *See Hudson v. McMillian,* 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care).  Proof of an objectively serious medical condition, however, does not end the inquiry.  The subjective component requires "subjective recklessness" in the face of the serious medical condition.  *Farmer*, 511 U.S. at 839‒ 40.  "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk."  *Rich v. Bruce*, 129 F. 3d 336, 340 n. 2 (4th Cir. 1997).

"Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Virginia Beach Correctional Center*, 58 F. 3d 101, 105 (4th Cir. 1995), quoting *Farmer,* 511 U.S. at 844. If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *Farmer*, 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *Brown* 240 F. 3d 383, 390 (4th Cir. 2001) citing *Liebe v. Norton*, 157 F. 3d 574, 577 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken).

The record evidence demonstrates that Plaintiff suffers from chronic uncontrolled diabetes. ECF No. 19, Ex. 2. The day of Plaintiff's fall (which he attributes to being given the incorrect dosage of his medication), his records reflect that he refused a diabetic assessment. *Id.*, Ex 1, p. 225. As such, Defendants were unable to determine whether Plaintiff required an adjustment to the standard number of units of insulin he was prescribed. *Id.*, Ex. 2. Nonetheless Joubert avers, to a reasonable degree of medical probability, that given Plaintiff's blood glucose levels taken on May 14, 2013, and his clinical presentation during his assessment that day, Plaintiff was not under or over medicated with insulin on the date of his injury. *Id.*, Ex. 2. There is simply nothing in the record to support Plaintiff's bald allegation that Defendants' conduct caused his injury on May 14, 2013.

As to the treatment of Plaintiff's fracture, the medical records demonstrate that Plaintiff was seen by a nurse immediately after his fall in the prison yard on May 14, 2013. *Id.*, Ex, 1, pp. 1-2. He was seen the following morning by Joubert, who ordered x-rays, prescribed pain

medication, ace bandages, a splint, directed Plaintiff be admitted to the infirmary on bed rest, ordered ice and elevation of the leg, and ordered an orthopedic consult.  *Id*., pp. 3-4.  To be sure there was a delay in providing Plaintiff with a splint, as no one implemented Joubert's orders until she returned to follow up with Plaintiff on May 19, 2013. Such delay, however, cannot be attributed to the named Defendants, and at most states a claim of negligence.

Even assuming that Plaintiff is correct that had he been seen by the orthopedist within seven days of his injury, the extent of his injury would have been minimized, the named Defendants are still entitled to summary judgment, as there is no evidence that the medical Defendants were aware of such a need for expedited treatment and failed to provide it. The initial reading of the x-rays showed a likely fracture to Plaintiff's ankle.  Joubert directed Plaintiff's transfer to the infirmary for monitoring and supervision.  *Id*., Ex. 2.  When the final reading of the x-ray was obtained, on May 20, 2013, five days after Plaintiff's injury, Joubert telephoned Dr. Krishnaswamy and discussed the results of the x-rays and Plaintiff's treatment options. Krishnaswamy determined that Plaintiff's ankle could continue to be managed with the splint and remaining non-weight bearing with regular elevation of the ankle pending his off-site consultation with Krishnaswamy. *Id*.  Krishnaswamy, later evaluated Plaintiff and ultimately performed surgery on Plaintiff's ankle.  *Id*., pp. 29-31; Ex. 2.

While Plaintiff's initial in person orthopedic consultation did not occur until over a month after his injury, his treating physician, Joubert, consulted telephonically with Krishnaswamy, the orthopedist, the day the final x-ray report was received.  The specialist advised that Plaintiff's treatment could continue as instituted by Joubert pending his in person evaluation.  There is simply no evidence that Joubert, or any of the other named Defendants, were aware that any additional delay in having Plaintiff seen by Krishnaswamy would cause any

harm.    Nor,  is  there  any  evidence  that  Plaintiff's  injury  was  occasioned  by  the  deliberate indifference to Plaintiff's needs by Defendants.    To the contrary, the records show that Joubert consulted with Krishnaswamy in a timely fashion and requested the off-site consult in a timely fashion.    The consultation was scheduled for June 7, 2013, approximately three weeks after Plaintiff's injury, but was cancelled by custody staff due to a conflict with Plaintiff's court appearance.    *Id*., Ex. 2.    Thereafter, the consultation was quickly rescheduled by medical staff. *Id*., Ex. 1,  p. 65; Ex. 2.

Plaintiff was seen by Krishnaswamy on June 21, 2013, who recommended surgery which was approved and occurred on July 18, 2013.    *Id*., Ex. 2.    Plaintiff was seen for follow-up by Krishnaswamy on July 22 and August 30, 2013, where he was cleared for full weight bearing. *Id.,* Ex. 2.    The next follow up visit with the orthopedist, scheduled for September 14, 2013, did not occur, not as alleged by Plaintiff due to interference by medical staff, but rather due to Plaintiff's own conduct.    He refused to remove his ankle wrap as directed by custody staff. While Plaintiff may have been correct that he need not have removed the ankle wrap, custody staff was without the paperwork to support his position and thus they refused to transfer him.    *Id*, Ex. 2.    Later, on October 30, 2013, Plaintiff refused transport due to a conflict between his scheduled medical appointment and a meeting with his attorney.    *Id*., pp. 151-152; Ex. 2.

Throughout his convalescence, the medical records show Plaintiff failed to comply with doctors' orders regarding proper care of his ankle and was at times combative with and manipulative of medical personnel.    Nonetheless, Plaintiff was evaluated regularly by medical staff, provided pain medication, crutches, a splint, ace bandages, an ankle support, home exercises, and referral to an off-site specialist.    Joubert offers that Plaintiff's ankle has healed well with a mild limitation in the range of motion.    *Id*., Ex. 2.    Joubert indicates that the ankle

shows continuing progress toward Plaintiff's pre-injury baseline. *Id.* Plaintiff disputes this assessment. ECF No. 27.

Plaintiff's disagreement with the course of treatment prescribed does not provide the framework for a federal civil rights complaint. *See Russell v. Sheffer*, 528 F.2d 318 (4th Cir. 1975). "[A]ny negligence or malpractice on the part of . . . doctors in missing [a] diagnosis does not, by itself, support an inference of deliberate indifference." *Johnson v. Quinones* 145 F. 3d 164, 166 (4th Cir. 1998). Without evidence that a doctor linked presence of symptoms with a diagnosis of a serious medical condition, the subjective knowledge required for Eighth Amendment liability is not present. *Id.* at 169 (actions inconsistent with an effort to hide a serious medical condition refute presence of doctor's subjective knowledge).

There is simply no evidence that Plaintiff's injury arose as a result of any conduct on the part of Defendants or that the named Defendants were aware of a need for additional or expedited medical attention and failed to provide it. Further, the record demonstrates that Plaintiff's ankle injury was not ignored by Defendants. To the contrary, Plaintiff was evaluated, moved to the infirmary, underwent diagnostic testing, physicians consulted regarding his care, he was provided an off-site evaluation, surgery and follow-up care, and was provided wound care, home exercises, and analgesic pain medication. Medical providers made sincere efforts to address his medical needs and provide appropriate treatment. Plaintiff was not without care while he awaited evaluation by Krishnaswamy. He received analgesic medication, was provided a splint, was kept in the infirmary for part of the time, was provided crutches and was directed not to put weight on his ankle.

Any delay in securing the off-site orthopedic consultation was not solely attributable to Defendants, who were required to wait for the final reading of Plaintiff's x-rays and then relied upon the advice of Krishnaswamy as to the efficacy of his care plan,  and also relied upon custody staff to transport Plaintiff to the off-site consultation.   There is no indication in Krishanswamy's notes  that if Plaintiff had been evaluated sooner, the result would have been different.  *Id*., p. 261-69.  Even if Krishnaswamy later told Plaintiff this, as he claims, there is no evidence that the medical Defendants were aware of the need for the earliest treatment of his ankle by Krishnaswamy and failed to ensure the care was provided.

Conclusion

The dispositive motion filed on behalf of Defendants will be granted.  A separate Order follows.


Date:  February 26, 2015               _____/s/_____
                                        DEBORAH K. CHASANOW
                                        United States District Judge